# CHARLESTON.

## CICERELLO v. C. & O. RAILWAY CO.

Submitted February 2, 1909.   Decided March 30, 1909.

1. APPEAL AND ERROR—*Discretion of Lower Court—Continuance.*
    Refusal to continue a case called for trial because of the absence of leading counsel, detained by an engagement in another court, where other competent counsel of record are present, will not be good cause for reversal. (p. 441.)

2. SAME.
    Refusal to continue a cause because of the absence of a material witness, not shown to have been served with process, and where proper diligence is not shown to have been used to secure the presence of the witness, will not be good cause for reversal. (p. 441.)

3. EXECUTORS AND ADMINISTRATORS—*Appointment—Collateral Attack.*
    The appointment of a non-resident, administrator, by a county court, though voidable, is not void in this State, and can not be questioned collaterally; and a special plea tendered, setting up such appointment as a defence, or for the purpose of defeating an action brought by such representative, is properly rejected. (p. 444.)

4. RAILROAD—*Injuries to Persons on or Near Track—Employes of Independent Contractor.*
    While it is the duty of employes of an independent contractor employed on or along a railroad, to use reasonable care for their safety, yet as between them and the railroad company this duty is reciprocal, and in such cases, the law does not require of such employes at work on or along the tracks to maintain a constant lookout for approaching trains and at the same time pursue their labors, but does require of the operatives of trains an active vigilance, and to give reasonable danger signals to attract the attention of the persons so employed, to avoid doing

injury to them, and to enable them to get out of the way of moving trains. Instructions to the jury to the contrary were rightfully rejected. (p. 445.)

Error to Circuit Court, Putnam County.

Action by Bruno Cicerello, administrator of the estate of Frank Olvino, deceased, against the Chesapeake & Ohio Railway Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

FERGUSON & ELLISON, NULL & HIGGINS, and C. J. VAN FLEET, for defendant in error.

SIMMS, ENSLOW, FITZPATRICK & BAKER, for plaintiff in error.

MILLER, PRESIDENT.

The plaintiff, as personal representative of Frank Olvino, deceased, seeks recovery of damages from defendant, for negligently causing the death of decedent on February 8, 1907, while employed by Rinehart & Dennis, independent contractors, near Scott station, in Putnam county, in excavating and widening a hill side cut for another track along defendant's main line. Olvino's duty, as alleged, was to keep defendant's main track cleared of the dirt and rock which fell from the steam shovel employed in making the excavation. The negligence charged is, that defendant's servants and employes so carelessly and negligently, and with such great force and violence drove and struck against the said Frank Olvino, a certain locomotive with cars attached, thereby inflicting upon him such severe and fatal wounds and injuries, that he then and there died.

On the trial there was a verdict and judgment for plaintiff for $1,500.00, and for errors alleged to have been committed preliminary to and during the progress of the trial, and for refusal of the court below to set aside the verdict and award defendant a new trial, the defendant seeks a reversal of the judgment below.

Of the preliminary rulings complained of, the first is, that the court refused to continue the case on motion of defendant, when called for trial, because of the absence of F. B. Enslow, defend-

ant's leading counsel; and because of the absence of J. B.
Thomas, one of its witnesses; and the second is, the rejection of
defendant's special plea number two tendered.   The motion to
continue was supported by the affidavits of said Enslow and R.
M. Baker, another attorney for the defendant.   Baker was also
cross-examined on the matter of his affidavit, and the clerk of
the court was also examined in relation to the issuance of sub-
poenas for the witnesses, and the want of service and return
thereof.   This evidence shows that Enslow was necessarily ab-
sent in attendance upon the United States Circuit Court of Ap-
peals at Richmond, on the day this case was set for trial, but that
Baker, who assisted in the conduct of the trial on behalf of the
defendant, was present.   The record of the trial shows that
Enslow was a member of the well known firm of Simms & Ens-
low, or Simms, Enslow, Fitzpatrick and Baker, that defendant's
special plea number two was signed by Alexander & Barnhart
and R. M. Baker, attorneys, and not by either of the other firms
of which Enslow was a member, and that Mr. Alexander was
also present and assisted in the trial, and that the defense was
conducted with skill and ability.   In the case of *Rossett* v.
*Gardner*, 3 W. Va. 531, relied upon, upon the question of the
absence of counsel, it was shown that appellant had used due
diligence to be prepared for trial; that one of his counsel was
unavoidably absent, and that the other, though present on a
preceding day, was for some cause, not explained in the record,
absent when the cause was heard, and the appellant was left
without the aid of any counsel.   In the present case defendant
had able counsel present to conduct the trial.   In the case
of *Myers and Axtell, Receivers* v. *Trice*, 86 Va. 835-841-2, the
absence of leading counsel on account of sickness, in connection
with the absence of an important witness, not summoned by rea-
son of mistake in name, was held good cause for continuance,
and denial of the continuance was, on writ of error, held suffi-
cient cause for a reversal of the judgment.   Several cases are
cited by the Virginia court in support of its ruling, two from
Georgia, one United States Circuit Court decision, and the case
of *Rhode Island* v. *Massachusetts*, 11 Peters 226.   In the latter
case, says the Virginia court, a continuance was granted by the
Supreme Court of the United States upon the ground that the
leading attorney for the state of Rhode Island was ill, although

the attorney general of that state was present. The case was
of exceptional importance says the court, and that the inference
was that the court was influenced more by the deep concern and
the high importance of the case than by any purpose to exem-
plify the rule in such cases. "In all such cases, however," says
the Virginia court, "the application should be watched with
jealousy, and the discretionary power of the court exercised with
caution; but, if there is no sufficient reason to induce the be-
lief that the alleged ground of the motion is feigned, a continu-
ance should be granted, rather than to seriously imperil the just
determination of the cause by refusing it." This court further
says: "Under the peculiar circumstances of the present case, and
especially in view of the very harsh ruling on the preceding mo-
tion, we are clearly of opinion that the circuit court erred in re-
fusing to continue the case on the ground of the absence of the
leading counsel of the defendants, by reason of sickness."

With respect to the absence of the witness Thomas, the evi-
dence shows that he was or had been in the employ of the de-
fendant company, was in fact the fireman on the engine at the
time of the killing of Olvino; that a subpœna for him and an-
other witness was secured from the clerk only six days before the
case was called for trial and sent to the company's counsel at
Huntington; that no return of service thereof on Thomas was
made, and the testimony of Baker, counsel for defendant on
cross-examination, shows that he sent the subpœna for Thomas
to the company's superintendent requesting him to secure the
presence of Thomas, who, he was told, was at Hinton, and
gave directions that an order be given him on the ticket agent
there for transportation. He did not know whether Thomas had
been served or provided with transportation. We do not think
the record shows due diligence on the part of defendant to se-
cure the presence of Thomas. Besides he was only one of the
numerous witnesses present at the time of the killing of the de-
ceased, including the engineer, and who were present and ex-
amined as witnesses on the trial and gave testimony. Motions
for continuance are generally addressed to the sound discretion
of the trial court. The judgment of the court thereon not being
reviewable on writ of error and appeal unless there has been man-
ifest abuse of such discretion. *Mullinax* v. *Waybright*, 33 W.
Va. 84; *Halstead* v. *Horton*, 38 W. Va. 727; *State* v. *Lane*, 44

W. Va. 730.   It was not shown what was proposed to be proven
by the witness.   Where the motion to continue is based on the
absence of a witness it must be shown that proper diligence to
secure his presence has been used, and if there is any ground to
suspect that the continuance is for delay, it must appear what
evidence the absent witness is expected to give.   *State* v. *Brown,*
62 W. Va. 546.   In *Tompkins* v. *Burgess,* 2 W. Va. 187, and
*Dinmey* v. *Wheeling, etc. R. Co.,* 27 W. Va. 33, it is said that
on such motion it must be shown that the same facts cannot be
proved by any other witness in attendance and that the party
whose witness is absent cannot proceed in the absence of such
witness.   The affidavit of Baker is that the witness is material
and that defendant cannot prove the same facts by any one else,
*as he is informed;* but on cross examination it is shown that he
does not know what Thomas will swear, except from his report.
It is not shown what this report was.   It is suggested in brief
of counsel, however, that as Thomas was fireman on the engine
that killed deceased, he would be a material witness, he and the
engineer being the only two persons on the engine, and that
each seeing what occurred from different points of view, this
rendered Thomas a most important witness.   But other wit-
nesses were present and gave testimony as to what was seen
and heard by them from their several view points, including the
ringing of the bell and the blowing of the whistle, and we can-
not see that the defendant was greatly prejudiced by the absence
of Thomas.   We cannot say from this record that there was any
abuse of the discretion of the court on the motion to continue.
We do not think this a parallel case to the Virginia case.   Evi-
dently the court there was more influenced by the arbitrary rul-
ing of the trial court in refusing to continue on the ground of
the absence of an important witness than because of the absence
of counsel.

Was there error in rejecting special plea number two?   By
this plea defendant challenged the right of plaintiff to maintain
this   suit   upon   the   ground   of   non-residence,   being   an
alien and a subject of the King of Italy, and thereby disquali-
fied and prohibited by sections 3258, 3259, Code 1906, from act-
ing as administrator.   One is not disqualified, however, to act
as administrator, because a *citizen* of another state or country.
Non-residence would disqualify plaintiff.   *Butcher* v. *Kunst,* de-

cided at the present term.   The plea, by reference to the citizenship of plaintiff, seems to imply, that citizenship is the equivalent of residency.

But can the appointment of the plaintiff be collaterally attacked on the ground of non-residence?   This depends upon whether such appointment would be void or voidable only.   It is argued that the appointment of a non-resident administrator is absolutely void, and we are cited to the following cases for this proposition:   *Scobey* v. *Gano,* 35 Ohio St. 551; *Sherman* v. *Ballou,* 8 Cowan 304; *Shipman* v. *Butterfield,* 11 N. W. 283; and also *Bell* v. *Love,* 72 Ga. 125; *Dooley* v. *Bell,* 87 Ga. 74; *Grande* v. *Chaves,* 15 Texas 550; *Perry* v. *St. J. & W. R. R. Co.,* 29 Kansas 420; *Jeffersonville R. R. Co.* v. *Swayne,* 26 Ind. 477, and *Central R. R. Co.* v. *C. Crogen,* 71 Ill. 177.   Some of these cases do seem to support the proposition, the others we do not think do to the extent claimed.   *Shipman* v. *Butterfield; Perry* v. *St. J. & W. R. R. Co.,* and *Jeffersonville R. R. Co.* v. *Swayne,* seem to hold that where the statute does not authorize, or inhibits the appointment of a non-resident administrator, the question is jurisdictional, rendering the appointment of a nonresident void.   In *Bell* v. *Love,* the appointment of the guardian, made at chambers, when the statute provided that such appointment could only be made at a regular term of the court, was held absolutely void.   In one or two of the cases where the law required a petition setting forth the jurisdictional facts, and the jurisdictional fact not being shown, the appointment was held void.   But whatever be the law of other states on the principal proposition involved here, it is certainly not the law of Virginia or of this state, that the appointment by the county court of a non-resident administrator, disqualified by the statute, is absolutely void and may be collaterally attacked.   Whether one applying for administration be a resident, within the meaning of the statute, is often a question of law and fact, to be determined by the county court, a court of general and exclusive original jurisdiction of all matters of probate; and having such jurisdiction its orders are generally not void, but only voidable on appeal, writ of error or some other process of review provided by law, and cannot be questioned collaterally.   *Andrews* v. *Avory,* 14 Grat. Va. Rep. Anno. 460, and other cases cited in monographic note.   However, there may be cases where the appoint-

ment would be absolutely .void and subject to collateral attack, as for example where letters of administration previously granted are still in force, or where there is a will naming an executor who is still alive, or where the granting of administration was made on the estate of a person not dead, or, as in *Bell* v. *Love, supra,* where the appointment is made at a special term of the county court, held without notice, or where the notice does not cover the subject of appointment of a personal representative.   In all such cases there is absolute want of jurisdiction of the subject matter or of the parties, and the rule respecting collateral attack does not apply.   In Van Fleet on Collateral Attack, section 590, the writer says: "The appointment of a wrong person, such as a non-resident, or a stranger before the widow had renounced her right, or an alien, as administrator, is not void, and his acts are binding after his removal."   We are therefore of opinion that the court did not err in rejecting defendant's special plea number two.

We are left to dispose of the case on its merits.   To do so rightly we must first determine what rules and principles govern cases of this character.   Counsel for defendant would have us apply rules and principles generally applied in the case of travelers, and watchmen at street and road crossings, and to trackmen and yardmen, and to trespassers, or persons using the tracks and side tracks of a railroad company by license.   We have numerous cases in this state, and there are many decisions in other states, holding it to be the duty of travelers in crossing a railroad to stop, look and listen, and that their failure to do so will excuse a railroad company from liability, although there be also negligence of trainmen in failing to give the usual signals at such points; that in the case of licensees or trespassers upon its track a railroad company owes them no duty except not to wantonly and wilfully run upon them without signal or warning; and that in the case of trackmen and yardmen, servants of the company, and presumed to be experts in the places of their employment, the law imposes upon them the duty to keep a lookout, and to know how to avoid danger, and a railroad company is not liable for injuries due to the negligence of trainmen, fellow servants of such employes, in failing to give the usual warning and signals in the movement of trains.   It is unnecessary for us to refer to this class of cases, or to discuss them in this

connection, for in our opinion this case belongs to a class which is *sui generis* and must be disposed of on the rules and principles applicable to it.

As we have said, Olvino was the servant of an independent contractor, and in no sense a servant of the railroad company, or a fellow servant of the engineer and fireman or of the other trainmen to whose negligence his death is imputed. He was not a trespasser on the track, not a trackman or a yardman employed by the defendant, nor was he using the track by mere leave or license of the railroad company. He was at the place of his death in the discharge of duties assigned him by his immediate employer, a place where he had the right to be, performing the very necessary and important duty of keeping the track clear of obstructions continually occurring in the work being conducted there by the independent contractor, that its property and lives of defendant's trainmen and the passengers on its trains might be protected and preserved. The place where Olvino was at work was in a deep side cut, within a few feet of where the steam shovel, engaged in making the excavations, was at work, and which the evidence shows, made loud and distracting noises when in operation. About three hundred feet west was a curve around the hillside, beyond which a train approaching from that direction could not be seen, and when the steam shovel was in operation, the blowing of the whistle and the ringing of the bell, as the evidence shows, could be heard only with difficulty by those in charge of, or in close proximity to the steam shovel. The defendant must be charged with full notice of these facts and circumstances surrounding the deceased, and the question is, what were the reciprocal duties and obligations of the deceased and the defendant under the circumstances? The authorities hold that while the duty to use reasonable care in this relation is reciprocal, and the servant of a contractor can not recover for injuries resulting from his own negligence, nevertheless the law does not require such persons at work on the track to maintain a constant lookout for approaching trains and at the same time pursue their labor, but it does require of the operatives of trains the exercise of an active vigilance to avoid injuring such persons and that they should give reasonable danger signals to attract the attention of men so employed so as to enable them to get out of the way before it is too late. 3 El-

liott on Railroads (2nd Ed.), sections 1265b, c and d, citing under section 1265b, *Haley* v. *New York &c. R. Co.,* 7 Hun, 84; *Goodfellow,* v. *Boston &c. R. Co.,* 106 Mass. 461; *Baltimore &c. R. Co.* v. *State,* 33 Md. 542; *McWilliams* v. *Detroit Mills Co.,* 31 Mich. 274; *Barton* v. *New York &c. R. Co.,* 1 N. Y. S. Ct. (T. & C.) 297, affirmed in 56 N. Y. 660; *Stinson* v *New York &c. R. Co.,* 32 N. Y. 333; *O'Leary* v. *Chicago &c. R. Co.* (Ia). 103 N. W. 362. Some authorities even hold that persons thus employed have a right to become engrossed in their employment and to expect that care and pains will be taken as to them. *Schultz* v. *Chicago etc. R. Co.,* 44 Wis. 638; *Goodfellow* v. *Boston etc. R. Co., supra.* . We think the true doctrine, is, as laid down in Elliott, that the duty to use reasonable care in such relation is a reciprocal duty, and that the servant of a contractor can not recover for injuries due to his own negligence. The duty of a railroad company on the other hand, in cases like the one we have in hand, would seem to require of it such reasonable provisions and precautions, and the giving of such proper and adequate warnings and signals, as will be reasonably adequate to avoid injury to persons thus employed. Here important work was going on in the building of a second track and many men, including the deceased, were engaged about the work. The conductor says he had no orders to slow down at this point; the engineer that he was driving the train at the rate of thirty miles per hour around this curve when he struck Olvino. But the engineer says, he blowed the whistle on the curve below Scott station, and also as he came around the curve on the straight line; that when he saw Olvino, he was standing there some eight feet from the track with his shovel resting in his hands, facing the track and with his head turned towards the approaching engine; and that, as he guesses, when within twenty or thirty feet of Olvino he just stepped upon the track, and that as he did so he pulled the brake and emergency and by the time he had done that the engine struck him that quick; that nothing he could have done at that moment could have prevented the accident. Another witness Rouper, employed by defendant to attend "to the interlocking and switches at Scott and the lamps also" says he was standing on the same side of the track about two hundred and ten feet from Olvino, and that when the train had pulled past him he saw Olvino walk right up across the

track in front of the train, but he did not know whether he had gone across or not until after he had been killed and the alarm given.   Jones, superintendent for Rinehart & Dennis, a witness for defendant, who was present says: "At the time he was struck I was 50 or 60 feet from him, and looking right at him. He was working on the main line * * * shoveling dirt from a ditch on the North side of track, and carrying it across and depositing it on the South side. * * * * I heard No. 8 coming, and when it was 550 or 600 feet away, Olvino walked across the track to the South side and dumped a shovel-full of dirt * * * about 6 feet from the rail.   After he had dumped this dirt he stood there probably 6 feet from the end of the ties for about four or five seconds, looking in the direction of approaching train, which was in plain sight of him, and coming along at about 40 miles an hour.   When the train was about 180 feet from him, he slowly walked upon the track, and was struck about the time he got in the center of it."   He says that Olvino where he was standing on the south side of the track was in a safe place; that about three hundred and fifty yards west of the point of the accident the engineer sounded the whistle and no other signal was given.   The conductor of the train, the only other witness for defendant throws little light on the subject.   His train, he says, was fifty minutes late that day; composed of seven coaches, each about seventy feet in length, making the length of the train some seven or eight hundred feet including the engine.   He is not questioned by either side as to whether or not the whistle was blown or the bell rung.

On the part of plaintiff it was proven by Cicerello that he was foreman in charge of the steam shovel, and of the men at work there with Olvino, and by several other witnesses employed there that they heard no whistle or bell for the cut.   A school boy thirteen years of age on his way home from school with his brother crossed the track between Scott station and the place where Olivino was hit and saw the train coming, and heard the whistle blow for the station but heard no whistle blown or bell rung to give warning to the men at work in the cut.   Griffith in the employ of the contractors, a witness examined by both sides, who was engaged, with another man, in laying track some four hundred feet from Olvino, and where he could see the station and the train approaching, says he heard no whistle or bell

rung for the cut; that he and his fellow workman spoke of the subject immediately after the train passed, the latter remarking that the whistle was not blown, he replying he had not heard it. He admitted, that the whistle might have blown and he not have heard it. The witnesses for the plaintiff also contradict flatly the evidence of Jones and of the engineer that Olvino stood looking at the approaching train, but on the contrary say that just before he was struck by the engine he was crossing the track diagonally with his back rather towards the approaching train and evidently did not see it coming; that the steam shovel made a loud noise. The plaintiff who was at work on the steam shovel testified that he did not hear the whistle nor see the train approaching or he would himself have called or warned Olvino. This is substantially all the material evidence bearing on the question of the negligence of defendant, and contributory negligence on the part of Olvino.

The defense of the defendant is want of negligence on its part and contributory negligence on the part of Olvino. In the case in hand these were questions of fact under the evidence solely within the province of the jury. There is such a conflict therein, both in respect to the blowing of the whistle and the ringing of the bell, and as to whether or not Olvino saw the train approaching and deliberately walked upon the track in front of the engine, that we are not permitted to say as a matter of law that defendant was without negligence or that Olvino was guilty of contributory negligence, resulting in his death. We need only refer to the authorities already cited in support of this proposition.

The defendant complains of the rejection of its instructions numbered five and seven. Number 5 would have told the jury that if they believed from the evidence that the whistle was blown or bell rung for the last crossing west of where the accident occurred such fact was immaterial, and that they might nevertheless find for the defendant if they should further find from the evidence that the defendant was not otherwise negligent. The crossing evidently referred to is the one crossed by the school boy between Scott station and the place where Olvino was killed, and near where the engine came in sight of Olvino, and the place where the whistle was usually blown to warn the workmen at work in the cut. This being so the effect of the instruction

would have been to tell the jury that although the defendant might have been negligent in failing to give the usual signals of warning to the men at work there, yet if the defendant was not otherwise negligent they might find a verdict in its favor. As thus interpreted it would have been contrary to the rules and principles governing the class of cases to which this belongs.

The seventh instruction would have told the jury that if they believed from the evidence that Olvino stepped upon the company's track in front of the approaching train so suddenly that the train could not have been stopped before striking him they should find for the defendant. This instruction wholly ignores the question of negligence of the defendant in failing to give the usual warning signals, and whether under all circumstances he was guilty of contributory negligence in crossing the track in the manner described. Both instructions we think, were properly rejected. These conclusions require an affirmance of the judgment below.

*Affirmed.*

BRANNON, JUDGE, (*dissenting*).

Very clear it is that the deceased knew well that trains might pass any time, and likely knew when this regular train was due, as he had been working at this spot two months. Very certain it is that he could have seen the train, if he had looked, and likely have heard it. And if the noise prevented hearing, that was still greater the demand to look out. .

And very probable that he stepped on the track when the train was close and visible—a rash act. If he did not step on the track when train was close, then he committed the rash act of standing on the track not looking or listening. In any view careless. It seems to me that the court excuses him from all measure of care and prudence, and leaves out of the case contributory negligence of the most signal character. It requires a train to whistle at every party of men repairing track, building bridges or doing other work. I thought that the law required of them care and watchfulness. In this case the danger was ever present and obvious, easily avoided—the negligence of the deceased great.

I hold that to hold the company liable in such a case its negligence must be wanton, and of this there is no proof. It was lawfully using its track, and the deceased upon it.