STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS

FILED
February 19, 2021

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**Sallie Murphy,**
**Plaintiff Below, Petitioner**

**vs.)  No. 19-1031** (Braxton County CC-04-2018-C-26)

**Ken Groves,**
**Defendant Below, Respondent**


## MEMORANDUM DECISION


Petitioner Sallie Murphy, by counsel Steven B. Nanners, appeals the Circuit Court of Braxton County's October 15, 2019, order entering judgment in respondent's favor following a bench trial on claims related to a boundary dispute between the parties. Respondent Ken Groves, by counsel Harley E. Stollings, filed a response.[1]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner and respondent own adjoining tracts of land in Braxton County, West Virginia. On May 10, 2018, petitioner sued respondent, alleging trespass, harassment, property damage, and interference with the quiet enjoyment of her property. Respondent filed an answer and counterclaimed for ejectment, trespass, and annoyance and inconvenience. In essence, the dispute between the parties concerned the shared boundary line between their respective pieces of property, which constituted the western boundary of petitioner's property and the eastern boundary of respondent's property. Petitioner maintained that the present location of England Run, a creek, constituted the western boundary of her property. Respondent, on the other hand, claimed that his mother, at a time when she owned both respondent's property and that currently owned by

---

[1] Following the date on which this case became mature for consideration, respondent's counsel was elected judge of the Sixteenth Family Court Circuit. Accordingly, he moved to withdraw as respondent's counsel, and by order entered on December 1, 2020, this Court granted the motion. Respondent is now represented by Allison J. Farrell.

petitioner, moved the creek to the west, and since that relocation, the boundary is a straight line beginning at a point near the mouth of England Run.[2]

In a 1906 deed in petitioner's chain of title, the land conveyed was described as "[b]eginning at the mouth of England Run." By at least 1966, however, deeds in petitioner's chain of title described the portion of her property relevant here as "BEGINNING at a stake at the mouth of England Run." The description of petitioner's property in her November 13, 1997, deed is consistent with the language contained in the 1966 deed: "BEGINNING at a stake at the mouth of England Run . . . ."

Concerning respondent's land, he was conveyed a one-third undivided interest in his property on May 15, 1957. Respondent's mother and aunt possessed the remaining two thirds interest. In 1988, respondent's land was conveyed to respondent's sons, and respondent retained a life estate.

The parties appeared for a bench trial on May 1, 2019.[3] Petitioner was represented by counsel during the initial stages of litigation; however, her counsel withdrew, and she represented herself at trial.[4] Respondent appeared in person and by counsel.

Petitioner testified that England Run constituted the western boundary of her property. In support of this position, she handed the court a stack of documents. The court admitted deeds and certain pictures petitioner offered, but it refused to admit petitioner's survey because the surveyor was not present to testify. The court explained, "Of course, the issue in a boundary dispute is normally what happens, is you subpoena the surveyor, and they are brought in the court and testify. Okay. The document itself doesn't self[-]authenticate." Following petitioner's testimony on direct, the court recessed for lunch, leaving respondent's cross-examination of petitioner for the afternoon.

When the parties returned to the courtroom at 1:15 p.m. following the lunch recess, petitioner informed the court that she "spoke to [her] surveyor, and he will be available." The court told petitioner that she did not "have that option," and petitioner responded, "I know, but I'm diabetic. . . . And my energy level after 3 o'clock is—is bad. (Laughter) I thought it would—when we had a 9 o'clock time, I thought, oh good, I'll be nice and fresh." The court asked petitioner

---

[2] Respondent claimed in the alternative that he acquired ownership of the disputed strip of property by adverse possession.

[3] The parties offered some testimony at trial to support their trespass, annoyance, inconvenience, and harassment claims, but it is not recounted here because the court dismissed those claims and neither party challenges those dismissals.

[4] The court reminded petitioner that "by representing yourself, you [are] presumed to understand the law, and you're required to conform to the rules and regulations of the law." After trial, petitioner retained her current counsel.

whether she subpoenaed her surveyor, and she replied, "No." The court explained, "You know the rule is if you don't subpoena them, then you can't ask for continuance of the hearing."[5]

During respondent's cross-examination of petitioner, petitioner recounted that, at some point between 1972 and 1974, respondent's mother "dredged the creek a little bit because of flooding." Petitioner was aware of respondent's assertion that the creek had been relocated, but she did not agree that that had occurred.

During respondent's case-in-chief, he called William Helmick, who owns a lot near the parties' properties and near the mouth of England Run. Mr. Helmick testified to his conversation with a surveyor that a certain stake, which was identified in a picture at trial, "is a starting point from a known referenced area that is used to start a reference for metes and bounds location for different areas . . . around." A young boy is also seen in the photograph with the stake. Mr. Helmick identified the boy as his nephew and said he would now be in his twenties.

Richard Dean, who lived in the vicinity of the parties' properties from 1952 to 1956, testified that England Run was excavated and moved, but he did not know when. Mr. Dean also did not have a recollection as to how far the creek was moved, only that the move widened the area between England Run and a road running along the creek. Mr. Dean estimated that that grassy area between the road and creek could be twice as wide now as it was when he lived in the area.

After Mr. Dean's testimony, at approximately 3:20 p.m., petitioner again informed the court that she is diabetic and that her "energy is gradually going, and when that happens my brain does not function. (Laughter) And I really don't know how to proceed, or how many questions—witnesses, or how to handle this." The court asked petitioner whether she needed "a snack or something." Petitioner said "no," that she had food, and that "[i]t's just usually . . . by 3 o'clock I'm in bed every day for a nap. But I don't know how to—I don't feel that I can—how much longer do you think it's going to be[, respondent's counsel], or can I ask that?" Respondent's counsel stated that he believed he could be finished in an hour, and petitioner responded, "I don't want to do it." The court stated that it intended to work until four, but it told petitioner that "if [she] get[s] dizzy, or . . . need[s] a break, [the court] will give [her] a break."

Luella Dancy, respondent's sister, testified that England Run, which spills into the Little Kanawha River, would "fill[] in from the river when the river would be up, and it was washing and eroding yard away." Ms. Dancy attributed the erosion to the numerous "little curves" in the creek; therefore, to straighten England Run, Ms. Dancy recalled that her mother Emogene moved the creek approximately fifty years ago.

Shelby Yeager, who was also familiar with the area that is the subject of these proceedings, testified that the creek had been moved. Like Mr. Dean, he could not recall when.

Respondent testified that he has owned an interest in his property since 1957, when he was nine years old. Respondent has always believed that he owned some land on the side of England

---

[5] Respondent also objected to petitioner's request for leave to call her surveyor at a later time.

Run claimed by petitioner, and, as other witnesses did, he testified that the creek was moved. Respondent further testified that the stake identified in Mr. Helmick's testimony and present in photographs entered into evidence was also known by him to have been placed by a surveyor to demarcate

> where the mouth of England Run used to be. Mr. Hendrix, the surveyor, place[d] that stake there as a reference point, because that is where it started, and Bill's property was taken off of my mother's. That's what we agreed to as being the mouth—the [e]ast side of England Run was on the south side of the river.

In other words, the stake depicted "what would've been the [e]ast bank of the [e]ast side of England Run before it was moved." Respondent testified that the stake depicted in the photographs is no longer there. Respondent did not know when the stake was removed or who removed it, but he recalled seeing it in 1999.

After respondent testified on direct examination, petitioner informed the court that she was "in no condition to cross-examine this witness." The court allowed a five-minute recess, after which petitioner again informed the court, "I can not [sic], at this time, examine [respondent]." The court told petitioner it would not continue the matter and reminded her that

> [y]ou're the one that filed this lawsuit. You had the duty to prosecute it. If you don't want to prosecute it, that's fine. It can be dismissed. But if you want to prosecute it, we're proceeding, and you had the opportunity to ask questions. If you don't ask questions of the witnessed [sic] today, you won't have the opportunity to ask questions later.

Petitioner proceeded with cross-examining respondent.

After respondent's testimony, respondent rested. Petitioner again moved to continue trial to allow her surveyor to testify. The court responded,

> You know—ma'am, [respondent's counsel] made a motion to continue because he didn't have a witness, Mr. Helmick, available. You objected to the continuance and said, "No, I went to the hearing. And I want him personally present here." And now you say, "Well I don't have my witness, and I want to [sic] continuance." What's good for the goose is good for the gander. . . . I'm not continuing it to allow you to bring in a witness, because one you didn't subpoena the witness. You didn't call the witness for today. You realized after you got here that your case was in trouble, and you needed that witness. . . . It doesn't work that way.

In closing, petitioner remarked that the testimony "was very interesting, very, very, interesting." Although petitioner claimed that, before the parties' litigation, she "kept asking—you know—questions you know—when did your mom move the creek, or when did this happen," she said "there were never any answers." She also stated that

4

this is the first time today I heard here the—the road wasn't exchanged. He moved the road and it was exchanged somehow, or he pushed it—the creek 30—30 feet over—I mean—I've heard lots of stories over the years, but I was very surprised at the testimony today.

Petitioner stated that she believed respondent's mother only "deepened the creek, but I don't think she straightened it."

In respondent's closing, he highlighted that petitioner's deed marks the beginning of her tract

"at a stake at the mouth of England Run," . . . [a]nd then you come around to the last call, and then it says, "[r]unning down England Run to the beginning." Well the beginning and the end is the stake. A stake at the mouth of England Run, . . . the boundary was never called England Run.

Respondent stated that the movement of the creek "just created a beautiful area of desir[able] real estate. . . . But the creek itself is not the boundary line." Rather, the boundary line is

a straight line from the stake at the mouth of the creek, all the way up to the other side of where it crosses the public road . . . . So that's what the case boils down to, is both parties['] deeds tie into a stake at the mouth of England Run. We have identified a stake at the mouth of England Run. The movement of England [R]un is not a movement of the boundary line, it's the creation of desirable property, which is what [respondent's] mother wanted to do 50 years ago, when she moved . . . the creek.

The court concluded that petitioner did not meet her burden of proof with respect to the location of the boundary line and that she did not rebut respondent's evidence of the line's location. The court found that England Run was excavated and relocated during the 1970s

so as to widen the area between the creek known as England Run and the road fording Little Kanawha River just east of the relocated [creek mouth]. The relocation of the creek widened the area between England Run and the road by as much as double the area prior to the excavation.

The court further found that respondent's evidence established that the stake referred to by Mr. Helmick and depicted in a photograph admitted into evidence "is on the line of the boundary between the tract deeded to [petitioner] . . . and the tract conveyed to [respondent]," and that "[a] line running from the former location of the stake . . . and running thence S 11 E. 50 poles to the public road is . . . the boundary line between the tracts owned by" the parties. The court's rulings were memorialized in its order entered on October 15, 2019, and it is from this order that petitioner appeals.

Petitioner raises two assignments of error on appeal. First, she argues that the circuit court erred in "moving [the] boundary line" as that ruling was "inconsistent with the evidence admitted

at trial." Second, she claims error in the court's failure to grant a continuance during the bench trial. The standard of review applicable to these challenges is articulated in Syllabus Point 1 of *Public Citizen, Inc. v. First National Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996):

> In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

In support of petitioner's first assignment of error concerning the circuit court's ruling on the parties' boundary line, she maintains that England Run constitutes the western boundary of her property. Although she acknowledges that respondent offered evidence at trial that England Run was relocated, she characterizes the evidence as "conflicting"; criticizes respondent's failure to introduce "photographic evidence" to support his claim that the creek was relocated, noting that the only photograph of the creek depicts it in its current location; and argues that the court relied on hearsay in determining that the stake established the starting point for the straight-line boundary between the parties' properties. Petitioner claims that, under Syllabus Point 6 of *Conner v. Jarrett*, 120 W. Va. 633, 200 S.E. 39 (1938), the court should have found that England Run constituted the boundary between the parties' properties. There, this Court held that

> [w]here a line is called to run from a given point to a stake on the bank of a non-navigable stream, and from that point three lines are called to run up the stream by courses and distances, which, surveyed on the ground from said stake, closely correspond to the course of the stream, the latter lines will, in the absence of a clear showing of intent to the contrary, be held to follow the stream ad medium filum aquae.

*Id*. Petitioner also argues that the court's conclusion as to the location of the boundary line was erroneous because respondent "failed to provide testimony to meet all of the elements of [his] adverse possession [counterclaim]."

Petitioner's arguments fail to demonstrate error in the court's ruling on the boundary line of the parties' respective properties. That the evidence concerning whether the creek was relocated or merely deepened was conflicting does not serve as a basis for overturning the circuit court's finding. "Following a bench trial, the circuit court's findings, based on oral or documentary evidence, shall not be overturned unless clearly erroneous, and due regard shall be given to the opportunity of the circuit judge to evaluate the credibility of the witnesses." *Harrell v. Cain*, 242 W. Va. 194, 202, 832 S.E.2d 120, 128 (2019) (citation omitted). This Court cannot say that the circuit judge's finding was clearly erroneous. The circuit judge heard evidence about the creek's relocation from various witnesses and evaluated the credibility of those witnesses. Moreover, petitioner offers no authority for her assertion that the relocation needed to have been supported by photographic evidence. Mr. Dean's, Ms. Dancy's, and Mr. Yeager's testimonies were sufficient to support a finding that the creek was moved.

Regarding petitioner's assertion that the court relied on hearsay in reaching its conclusion, we note that West Virginia Rule of Evidence 803(20) specifically excludes from the rule against hearsay "[a] reputation in a community—arising before the controversy—concerning boundaries of land in the community or customs that affect the land, or concerning general historical events important to that community, state, or nation." Respondent's and Mr. Helmick's testimony as to the significance of the stake in demarcating the parties' boundary lines fits within this exemption and was, therefore, properly admitted and relied upon by the court.

Syllabus Point 6 of *Conner* likewise offers no support for petitioner's arguments. In that case, the Court "examine[d] the lines as laid down on the plats introduced in evidence" and found that "using the center of the branch as the termini and following the courses and distances designated in the titled papers, the lines closely follow the branch." 120 W. Va. at 645, 200 S.E. at 45. Although the calls did not align directly with the branch, the Court concluded that "[i]t seems reasonable . . . that what the parties to these deeds intended was to make these three lines run with Mink Shoal Branch, but they used specific calls which, if laid down on the ground, would create a situation slightly different from that we may believe was intended." *Id.* Against this backdrop we expressed Syllabus Point 6. But petitioner did not show below that the deed calls tracked or closely tracked England Run. In fact, aside from quoting this Syllabus Point and claiming that the court should have "follow[ed] a non-navigable stream as priority in determining a boundary," she does not claim before this Court that the deed calls follow England Run. Thus, she has not demonstrated either the applicability of *Conner* or error in the circuit court's finding that the boundary between the parties' properties is a straight line.

In her final argument challenging the court's conclusion regarding the boundary line, petitioner states that respondent "failed to provide testimony to meet all of the elements of [his] adverse possession [counterclaim]." A review of the trial transcript reveals that respondent did not pursue his adverse possession theory at trial, however. Instead, respondent relied on the language in the parties' deeds. The court's conclusion on the boundary line, likewise, does not rest on any findings of adverse possession. Because the boundary line issue was resolved without reference to adverse possession, petitioner has not demonstrated error by claiming that respondent failed to establish adverse possession.

In petitioner's final assignment of error, she claims that the court erred in denying a continuance "when she was suffering health issues related to her diabetes." She argues that when she moved for a continuance, the court could have "easily rescheduled" the trial, highlights that no jury was impaneled, and asserts that respondent would not have been prejudiced or harmed by a continuance.

"A motion for continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of discretion." Syl. Pt. 2, *State v. Bush*, 163 W. Va. 168, 255 S.E.2d 539 (1979).

The court advised petitioner that, in representing herself, she would be held to the same requirements as would a licensed lawyer. Petitioner stated that she understood. Only when her self-representation became a problem—i.e., she failed to subpoena her surveyor—did she announce that she was a diabetic and seek a continuance. But "[r]efusal to continue a cause because

of the absence of a material witness, not shown to have been served with process, and where proper diligence is not shown to have been used to secure the presence of the witness, will not be good cause for reversal." Syl. Pt. 1, *Cicerello v. Chesapeake & Ohio Ry. Co.*, 65 W. Va. 439, 64 S.E. 621 (1909). The court was sympathetic to petitioner's condition, offering numerous breaks throughout the short trial and a snack. Further, the proceedings were concluded before 5:00 p.m. Accordingly, we find that the circuit court offered appropriate accommodations to petitioner to address any challenges posed by her diabetes, and it did not abuse its discretion in denying a continuance.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** February 19, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison

**NOT PARTICIPATING:**

Justice William R. Wooton